766 So.2d 73 (2000)
BRIARWOOD, INC., Appellant,
v.
CITY OF CLARKSDALE, Mississippi, Appellee.
No. 1999-CA-01054-COA.
Court of Appeals of Mississippi.
August 15, 2000.
*74 Charles M. Merkel, Jack R. Dodson, Jr., Clarksdale, Attorneys for Appellant.
H. Hunter Twiford, III, Curtis D. Boschert, Clarksdale, Attorneys for Appellee.
BEFORE KING, P.J., IRVING AND LEE, JJ.
KING, P.J., for the Court:
¶ 1. Briarwood, Inc. (Briarwood) appeals a decision of the Coahoma County Circuit Court, which affirmed a decision of the Board of Mayor and Commissioners of the *75 City of Clarksdale (City) to rezone 18.72 acres owned by Briarwood from R-4, Multi-family Residential, to R-2, Single and Two Family Residential. Briarwood raises two questions regarding the circuit court's decision. As stated by Briarwood they are (1) whether the Circuit Court erred in finding that the decision of the Board of Mayor and Commissioners of the City of Clarksdale re-zoning the appellant's property from R-4 to R-2 was not arbitrary, capricious, unreasonable or confiscatory; and was supported by substantial evidence; (2) whether the circuit court erred in finding that the actions of the Board of Mayor and Commissioners of the City of Clarksdale did not constitute illegal "Spot Zoning".
¶ 2. Finding no merit in these allegations, this Court affirms.

FACTS
¶ 3. On October 11, 1971, Briarwood purchased a ninety acre tract of undeveloped farmland in Coahoma County. This tract was at that time outside the corporate boundary of the City of Clarksdale. In 1971 the Coahoma County Board of Supervisors re-zoned this property from A-1, Agricultural, to R-5, Multi-Family, Residential. The Board of Supervisors eliminated the R-5 zoning designation in 1974, and designated all R-5 zoning as R-4.
¶ 4. Briarwood began to develop its tract in 1971, and over the years developed some thirty-three acres as single family residential lots, constituting in excess of 100 lots. Additionally, Briarwood sold approximately twenty-nine acres for development of three multi-family subsidized housing projects and a nursing home. Those projects were (1) Wade Walton Estates, which had 108 apartments and 350 residents, (2) Higgins-McLaurin Arms, which had 105 apartments and 390 residents, (3) Federation Towers, with 52 apartments and 87 residents, and (4) the 120 bed River Oaks Convalescent Center. All of this development occurred prior to annexation of this tract by the City of Clarksdale.
¶ 5. In 1992, this tract was annexed and brought into the corporate boundary of the City of Clarksdale. When annexed in 1992, this tract retained the R-4 zoning designation given to it by the Board of Supervisors on May 15, 1974. When annexed, this tract became a part of Clarksdale's Fourth Ward.
¶ 6. Within close proximity to these apartment complexes are several other units of low income subsidized housing projects. They are (1) Eastgate Apartments, with 100 apartments and 350 residents, and (2) Chapel Hill Heights, with 100 apartments and 325 residents.
¶ 7. Additionally, there are several other low income subsidized housing complexes within Clarksdale's Fourth Ward. They are (1) Jack Johnson Estates, 40 apartments and 270 residents, (2) Magnolia Courts, 120 apartments and 205 residents, (3)Evergreen Manor, 96 apartments for the elderly, with 110 residents, (4) Windcrest Manor, 58 apartments for the elderly and disabled, with 70 residents, and (5) Willow Park Apartments, 80 apartments, with 270 residents.
¶ 8. All of these subsidized housing projects are located within Clarksdale's Fourth Ward, which contains almost 90% of all subsidized low income apartments within the City of Clarksdale.
¶ 9. At its meeting of April 6, 1998, Briarwood informed the City of the intent to construct another 23 units of subsidized low income housing on 2.3 acres of its property. A number of home owners in the area of the proposed housing project offered significant objections to this project. At that time, the City adopted a temporary moratorium on the construction of multi-family housing, except duplexes. On May 11, 1998, after due notice and hearing, the City continued the moratorium on the construction of multi-family housing for an additional thirty days, so that it might gather information to address *76 the concerns raised. In an effort to address these concerns, the City requested reports from the fire, police and public works departments.
¶ 10. In May, residents of the area filed an application to re-zone the remaining undeveloped portion of Briarwood's 90 acre tract (18.72 acres) from R-4 Multi-family Residential to R-2 Single and Two Family Residential. This application was submitted to the Planning Commission.
¶ 11. After being continued several times, the Planning Commission conducted a hearing on the application, and declined to recommend re-zoning, but in doing so, it made findings of fact as follows:
That there is a concentration of multi-family residential complexes in the area.
That a number of the area residents object to any further or additional multifamily housing complexes in the area.
That drainage problems currently exist in the affected area which are exacerbated by the number of multi-family residential buildings.
That there is only one means of ingress and egress into the affected area, and that there is increased traffic flow and congestion as a result thereof.
That the Clarksdale Fire Department responds to a great number of calls in the affected area.
That the Clarksdale Fire Department experiences difficulty in maximizing the use of its equipment due to the configuration of the multi-family complexes currently in existence in the area.
That the Clarksdale Police Department responds to a great number of calls in the affected area.
That the multi-family housing complexes tend to become recruiting areas for gangs and criminal activity.
That none of these findings of fact by the Planning Commission have been challenged by any of the parties, including Petitioners, Briarwood or Clarksdale Place.
¶ 12. After notice, the Board of Mayor and Commissioners on September 8, 1998 conducted a public hearing on the re-zoning application.
¶ 13. Those neighborhood residents favoring the zoning change gave several reasons to support their request. Included among them were (1) there was an increase in crime and criminal activity, most of which was attributable to residents of the projects, (2) heavier traffic, (3) traffic congestion, because of limited ingress and egress, (4) property devaluation, and (5) dilution of minority voting strength in violation of the Civil Rights Act of 1964, and the Voting Rights Act of 1965.
¶ 14. Briarwood, in opposing the zoning change, offered several reasons for its opposition including (1) the property had been zoned multi-family since October 1971, (2) that all persons purchasing homes in the area did so after the property had been zoned multi-family, (3) that the City could provide greater fire and police protection, and (4) that Briarwood would suffer a substantial financial loss if the zoning change were approved.
¶ 15. The hearing concluded and the Board of Mayor and Commissioners agreed to consider the requested zoning change at its September 14, 1998 meeting. This matter was taken up by the Mayor and Board of Commissioners at its September 14, 1998 meeting, at which time it was determined that "that such change in the zoning classification is in the best interest of the City of Clarksdale and the citizens thereof, the public health, safety and welfare so demand."
¶ 16. In reaching this decision, the City of Clarksdale issued a thirty-three page document which (1) set forth the history and development of this tract, (2) the testimony received, (3) the personal familiarity of the Board of Mayor and Commissioners with the area, and (4) the basis for the City's decision.
¶ 17. The City found that there had been "substantial change in the character of the *77 neighborhood, which was undeveloped agricultural farmland when initially re-zoned to R-4 in 1974, but which has subsequently developed predominately in single family residential neighborhoods, with a clustering of multi-family housing complexes in the area. The substantial change in character of the neighborhood justifies the rezoning the property to R-2, Single and Two Family Residential, which is in keeping with the majority of the surroundings lands closest to the property (except the Wade Walton Estates property)."
¶ 18. The City found that there existed health and safety concerns, stating:
The Board of Mayor and Commissioners has received testimony from area residents and City officials, including the Police Chief and Juvenile Officer, and does hereby find and determine that the clustering of subsidized multi-family housing developments does, in fact, cause increased criminal, and particularly gang and juvenile related, activity. These disadvantaged youths, who have little to occupy their free time and excess energy, join gangs. Gangs, particularly in neighboring apartment complexes, are often at odds with each other, and "turf protection" and "gang warfare" frequently results. It is the experience of the Clarksdale Police Department, as related by the Police Chief and one of the Juvenile Officers, that more subsidized apartment complexes in close proximity to each other in the Sasse Street area have created more gang related problems, and that the construction of additional multi-family complexes in close proximity to those currently existing will only create additional problems. The Board hereby finds and determines that these criminal, juvenile and gang related problems would be further exacerbated by allowing additional multi-family housing complexes to be developed in the Sasse Street area, including upon any portion of the Property. The Board of Mayor and Commissioners has received testimony and evidence from the Clarksdale Police Department that bears out the area residents' complaints, and the Board does hereby find and determine that there are higher rates of criminal activity in the Sasse Street area than in other areas of the City, caused predominantly by residents of the multi-family housing complexes; that burglaries, thefts, vandalism, trespasses, weapons discharge and similar crimes are committed in greater numbers in the Sasse Street area than in other areas of the City, a phenomenon created or exacerbated by the clustering of multi-family housing complexes in close proximity to each other, with devastating effects on the single family neighborhoods in the area; and that this phenomenon has been a substantial and significant change in the area since the 1971(1974) initial re-zoning of the area from A-1 to R-4.
¶ 19. The City made specific findings on fire protection, stating:
The Board of Mayor and Commissioners has heard testimony and received evidence from the Clarksdale Fire Department and the Fire Chief to the effect that the Clarksdale Fire Department receives a disproportionate number of its fire service calls from the Sasse Street area, and particularly the subsidized multi-family housing projects; that a great number of these calls (again, disproportionate to the other areas of the City)are false alarms; and that the Clarksdale Fire Department spends disproportionate amounts of its time, manpower, equipment, facilities and energies in responding to fire calls in the Sasse Street multi-family subsidized projects. The City of Clarksdale has three fire stations, protecting its total land area and its almost 23,000 residents. One of fire stations is located on Sasse Street, in close proximity to the subject area. Nonetheless, further multi-family subsidized units developed in the immediate area would put unreasonable and unnecessary stress on the Sasse Street Fire *78 Station resources, which has significant other properties within its primary response area, and the development of future multi-family subsidized projects in other areas of the City would spread the fire response burdens more equally. Spreading out future developments into other areas of the City would also allow the Clarksdale Fire Department to provide better response and protection to all of the citizens of Clarksdale.
¶ 20. The City made specific findings on drainage, stating:
The Board of Mayor and Commissioners has received reports from the City Engineer and the Public Works Director to the effect that there are significant drainage problems in the Sasse Street area, which have existed since the initial development of the area by Briarwood while the area was a part of Coahoma County, and which resulted primarily from the developer's installing insufficient infrastructure improvements in place, for cost saving purposes, and from its developing drainage to county or rural, rather than urban, standards, which was allowed by the Coahoma County Board of Supervisors during the early development of the area in the 1970's and 1980's. That, for example, Coahoma County apparently approved open ditch drainage, a rural standard in all of the Briarwood Subdivision developments, rather than the curb and gutter urban drainage standard required by the City, following the annexation of the area in 1992. The City has attempted to apply the more stringent urban drainage standards to developments throughout the City, but a significant problem still exists, particularly in the Sasse street area.
In the event of even moderate rainfall, significant flooding occurs in the Sasse Street area. Often, the street, which was constructed by the initial developer below flood plain, floods, causing area residents to be denied access to their homes. There is also a significant drainage problem in the Wade Walton complex, which is directly adjacent to the proposed Clarksdale Place Site. During moderate to heavy rainfalls, there is widespread flooding of the Wade Walton complex area, and Wade Walton residents have complained extensively to the City and its officers of flooding of their apartments, parking lots and the surrounding areas.
The Board of Mayor and Commissioners hereby finds and determines that further development of multi-family residential complexes in the Sasse Street will only exacerbate the existing drainage problems. All future developments within the area for any approved use must be closely monitored by the City to insure adequate drainage, both of the area being developed, and the surrounding areas affected by any future development.
The Board of Mayor and Commissioners further finds and determines that these drainage problems did not exist in 1971 when the Property was initially re-zoned (or in 1974 when the zoning correction occurred), from Agricultural to Multi-family Residential, as the area was virtually all agricultural, and sufficient agricultural drainage facilities existed to adequately handle the problem at that time. However, the subsequent development of the property by Briarwood and its successors in title, and their failure to install adequate drainage facilities, have caused substantial public health and safety concerns.
¶ 21. The City made specific findings on the streets and traffic, stating:
Sasse Street was initially constructed to Coahoma County's rural development standards, which are less stringent than those of the City of Clarksdale, and it is unlikely that the developer, at the time of its construction, could have envisioned the amount of traffic presently utilizing the street. Further multi-family housing development would only cause more traffic on the street, with even more *79 congestion and increased attendant problems.
The Public Works Department has conducted traffic studies, and has found that, during peak hours, significant numbers of vehicles utilize Sasse Street. These traffic studies were previously reported to the Board, and are reflected in other minute excerpts of the Board of Mayor and Commissioners, including its June 15, 1998 meeting. The intersection of Sasse and Ritchie is a particularly busy intersection, at which a disproportionate number of vehicular accidents occur.
The Board of Mayor and Commissioners hereby finds and determines that area residents' complaints regarding traffic congestion, long delays in exiting their driveways, and increased traffic accidents are substantiated by reports from the Public Works and the Police Departments. The Board hereby finds and determines that the City of Clarksdale should neither consider nor allow any further developments in the Sasse Street area whatsoever without significant ingress and egress improvements, including construction by developers of new, alternate routes. Any future development of the Property by Briarwood for approved uses must take into account the existing traffic problems, and the need for alternate solutions.
¶ 22. The City made specific findings regarding the impact of the proposed construction on the Voting Right Act, stating:
The Board of Mayor and Commissioners finds and determines that there is a significant likelihood that future residents of the Sasse Street area will continue to be predominantly of African American descent. The overall black voting age population of the City of Clarksdale, following the completion of the 1992 annexation and the approval by the Department of Justice of the voting rights plan submitted by the City of Clarksdale under the Voting Rights act of 1965, was 56.8% BVAP. The minority population of Ward 4 is substantially higher in excess of 96%. To allow further concentration of minority voters in Ward 4 by authorizing the construction of additional multi-family housing complexes in the Ward 4 area of the City of Clarksdale, could cause the city to run afoul of the voting Rights Act, a violation which the City Board obviously wishes to avoid.
The aims of the Voting Rights Act in allowing increased minority participation in local government affairs, including holding public office and voting for candidates of their choices, would be furthered and enhanced by requiring that future multi-family subsidized housing projects be developed in other Wards of the City, rather than continuing to concentrate multi-family housing projects in Ward 4. It is the intent of this Board to foster future multi-family subsidizing housing development in other areas of the City, in order to prevent packing and clustering.

DISCUSSION

WHETHER THE CIRCUIT COURT ERRED IN FINDING THAT THE DECISION OF THE BOARD OF MAYOR AND COMMISSIONERS OF THE CITY OF CLARKSDALE REZONING THE APPELLANT'S PROPERTY FROM R-4 TO R-2 WAS NOT ARBITRARY, CAPRICIOUS, UNREASONABLE OR CONFISCATORY, AND WAS SUPPORTED BY SUBSTANTIAL EVIDENCE

STANDARD OF REVIEW
¶ 23. Judicial review of zoning matters is limited. "The zoning decision of a local governing body which appears to be fairly debatable will not be disturbed on appeal, and will be set aside only if it clearly appears the decision is arbitrary, capricious, discriminatory, illegal or is not supported by substantial evidence." City of Biloxi v. M.C. Hilbert, 597 So.2d 1276, 1280 (Miss.1992), Fondren North Renaissance *80 et al. v. Mayor and City Council of the City of Jackson, 749 So.2d 974, 977 (Miss.1999).
¶ 24. Those seeking re-zoning bear the burden of persuading the local government that (1) there was a mistake in the original zoning, or (2) the character of the neighborhood has so changed to justify reclassification, and that there is a public need for rezoning. Old Canton Hills Homeowners Ass'n. v. Mayor and City Council of the City of Jackson, 749 So.2d 54, 61 (Miss.1999). The record of the rezoning decision must contain the two foregoing findings, and must be supported by substantial evidence. Id.
¶ 25. The decision of a local governing board is presumed valid, and the burden is upon the person seeking to set it aside to show that it was arbitrary, capricious and unreasonable. Board of Aldermen, City of Clinton v. Conerly. 509 So.2d, 877, 884 (Miss.1987); Walters v. City of Greenville, 751 So.2d 1206, 1211 (Miss.Ct. App.1999). If the re-zoning decision of the City of Clarksdale is to be reversed, Briarwood bears the burden of proving that the decision rendered was arbitrary, capricious, discriminatory, or beyond the legal authority of the City's board or unsupported by substantial evidence. Mayor and Board of Aldermen, City of Clinton v. Hudson et al., 1999-CA-00263-COA (¶ 6), ___ So.2d ___, 2000 WL 760939 (Miss.Ct. App.2000), (citing McWaters v. City of Biloxi, 591 So.2d 824, 827 (Miss.1991)).
¶ 26. Arbitrary, as defined by our supreme court, refers to an act done not according to reason or judgment, but which is solely dependent upon the will alone. It has defined capricious "as any act done without reason, in a whimsical manner, implying either a lack of understanding of or a disregard for the surrounding facts and settled controlling principles." Burks v. Amite County School District, 708 So.2d 1366 (¶ 14) (Miss.1998).
¶ 27. Applying these definitions to the decision of the City of Clarksdale, to re-zone this property from R-4 to R-2, we cannot say that this action on its face was arbitrary and capricious. The City of Clarksdale issued a detailed and well reasoned statement as to the basis of its actions. This statement clearly indicates a reasoned rather than arbitrary action.
¶ 28. The City of Clarksdale provided a detailed history, past and present, of the development of this property and this area. It then related the re-zoning request to that history. This action clearly demonstrated the lack of capriciousness by the City of Clarksdale.
¶ 29. Having found that the action of the City of Clarksdale is not on its face arbitrary or capricious, we are left with the question of whether this decision is fairly debatable.
¶ 30. "Both zoning and re-zoning are legislative functions. As such, the judicial department of the government of this state has no authority to interdict either zoning or re-zoning decisions which may be said `fairly debatable.'" Saunders v. City of Jackson, 511 So.2d 902, 906 (Miss.1987); Broadacres, Inc., v. City of Hattiesburg, 489 So.2d 501, 505 (Miss. 1986); Woodland Hills Conservation Ass'n, Inc. v. City of Jackson, 443 So.2d 1173, 1179-80 (Miss.1983).
¶ 31. Specifically, the fairly debatable standard applies to the legislative question whether there has been a change in the character of the neighborhood and whether there is a public need for the re-zoning. If these two questions may, on the matters before the Board of Mayor and Commissioners, be said fairly debatable, there is no judicial authority to interfere and the action taken by the city zoning authorities, be it pro or con the proposed re-zoning, must be allowed to stand. Saunders v. City of Jackson, 511 So.2d 902, 906-07 (Miss.1987); Coleman v. Southwood Realty Co., 271 So.2d 742, 743 (Miss.1973). Luter v. Hammon, 529 So.2d 625, 628 (Miss.1988).
*81 ¶ 32. The City found substantial evidence to support re-zoning. It seems appropriate to review some of the evidence here.

Change in Character
¶ 33. When the property was first zoned R-5 in 1971, and subsequently R-4 in 1974, by the Board of Supervisors it was largely undeveloped farmland. Since its purchase by Briarwood in 1971, thirty-three acres of this property have been developed into residential lots. Thirty acres have been used for low income projects, containing 265 apartments. Two other low income housing projects in the immediate vicinity have 210 apartments. These five projects have more than 1500 residents. Additionally there are 375 other low income apartments in this Ward. The total of 870 low income apartments has more than 2, 400 residents. By the County's calculations, if it takes 2.3 acres for 23 apartments of subsidized housing, then the tract of 18.72 acres could be used to construct 187 additional units of subsidized housing. At an average of three residents per unit, this represents an additional 561 persons in the neighborhood.

Health and Safety
¶ 34. These housing projects were an incubator for criminal activity. More burglaries, thefts, acts of vandalism, trespass and weapons discharge were committed in the area of these projects, and by residents of these projects than any other area of the City. Juvenile crime and gang warfare, involving residents of the housing projects, were frequent occurrences.

Fire Protection
¶ 35. A disproportionate number of fire alarms, and false alarms are answered in these housing projects, commanding a disproportionate use of manpower and equipment.

Drainage
¶ 36. The drainage was built to a county standard to accommodate a sparsely populated area. The present drainage is insufficient to accommodate a high concentration of people, like that found in these low income housing projects.

Street and traffic
¶ 37. The streets were built for low volumes of traffic. There is limited ingress and egress to and from this area. There is a disproportionate volume of traffic and traffic accidents in this area.

Voting Rights
¶ 38. Because most occupants of low income housing are black, the concentration of additional low income housing in this area, would unlawfully dilute black voting strength, in violation of 42 U.S.C. § 1973, et seq., Voting Rights Act of 1965. The minority population of this ward is 96% and would only go up with the increased concentration of low income housing.
¶ 39. Each of these matters is a legitimate concern in zoning matters and under the facts of this case are fairly debatable. While each is a legitimate concern, we take special note of the voting rights question.
¶ 40. Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, "prohibits any practice or procedure that, `inter[acting] with social and historical conditions,' impairs the ability of a protected class to elect its candidates of choice on an equal basis with other voters. Thornburg v. Gingles, 478 U.S. 30, 47, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986)." Voinovich v. Quilter 507 U.S. 146, 153, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993).
¶ 41. The Supreme Court has specifically held that dilution of minority voting strength can be caused "by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." Id. at 153, 113 S.Ct. 1149. This creation of excessive majority districts is called packing. The development of additional low income apartments in this area, with predominant minority population, would appear to constitute packing, and accordingly, to be contrary to the requirements *82 of the 1965 Voting Rights Act. The decision of the City of Clarksdale to abide by the requirements of the 1965 Voting Rights Act is neither arbitrary nor capricious.
¶ 42. Having found that the actions of the City of Clarksdale were neither arbitrary nor capricious and fairly debatable, this Court finds no merit in Briarwood's first issue.
¶ 43. Briarwood has asked this Court to hold that the actions of the City of Clarksdale designating this property R-2 was confiscatory.
¶ 44. This Court, in Walters v. City of Greenville, 751 So.2d 1206 (Miss.Ct.App. 1999), adopted the taking definition adhered to by the federal courts. In Walters, we quoted with approval the following:
"[T]here is a taking of property when government action directly interferes with or substantially disturbs the owner's use and enjoyment of the property." Brothers v. U.S., 594 F.2d 740, 741-42 (9th Cir.1979) Walters, 751 So.2d at 1210. "A taking is effected if the application of a zoning law denies a property owner of economically viable use of his land. This can consist of preventing the best use of the land or extinguishing a fundamental attribute of ownership." Vari-Build, Inc. v. City of Reno, 596 F.Supp. 673, 679 (D.Nev.1984). Neither of these definitions would seem to suggest a confiscation of Briarwood property.
¶ 45. There is no substantial interference with Briarwood's use and enjoyment of this property. The City still allows use of this tract for residential development. It does, however, limit the number of residential dwellings which can be constructed on this tract. There is no impairment of an economically viable use of this tract by Briarwood.
¶ 46. In considering this issue the City found:
There has been competent testimony offered, and the Board of Mayor and Commissioners does hereby find and determine, that there exists a need for additional single family residential subdivisions to be developed in the Ward 4-Sasse Street area, and that the property would be suitable for and well suited to such development.
The Board has heard testimony from Cohen and his appraiser, Mr. Walker, that the fair market value of the property if it continued to be zoned R-4, Multi-Family Residential, would be $12,500 per acre, but if it were re-zoned to R-2, Single and Two Family Residential, the property would be worth only $1,500 per acre, the agricultural value for cropland. The Board hereby rejects that testimony, based upon its own experiences in the Clarksdale, Mississippi area. Specifically, the Board finds that, while Briarwood may be able to sell the 2.3 acre tract to Clarksdale Place for $50,000, Mr. Walker's estimate of $12,500 per acres for future sales of the balance of the property for multi-family development is greatly inflated. The Board is aware that virtually all subsidized multi-family residential development is driven almost exclusively by federal governmental funding, such as the RDA funding to be received by Clarksdale Place; that such governmental financing is extremely competitive and is spread around the State of Mississippi; and that is highly unlikely that multi-family developers will receive government funding to develop other multi-family subsidized complexes in the reasonably foreseeable future upon the property. The Board further finds and determines, based upon Cohen's own testimony, that, at a prior average sales price of $7,500 per single family residential lot, and with three to five lots being developed per acre, Briarwood could reasonably expect to net virtually the same monies from its development of the area in single family residential lots, for which *83 there is a need, particularly among the more affluent African American citizens.
Cohen also complained that he may not be able to readily market the portions of the property adjacent to the Wade Walton estates as single family residential, as he recognizes (as he testified) that "no one wants to live next to a project." However Briarwood has developed the entire 90-acre tract as it has seen fit, and cannot now complain because it sold the Wade Walton parcel to its developer, although Cohen candidly admits that, had he known how poorly the Wade Walton project would be constructed and managed, he might not have sold the tract to be developed for that project.
Briarwood has argued that a re-zoning of any portion of the property from R-4 to R-2 would constitute a "takings" by the City of Clarksdale, thus entitling Briarwood to compensation from the City for such re-zoning. The City's interpretation of that the law relating to takings, as expressed by the courts, requires that Briarwood have no reasonable remaining use of its property following any rezoning in order for there to be a compensable taking. In this case, Briarwood is free to develop the property in single family residences, duplexes, and/or such other conditional uses as may be approved by the Board of Mayor and Commissioners under Section 507 of the Zoning Ordinance, all of which are reasonable uses of the property, and which would allow Briarwood to continue to develop the property in an orderly fashion. This, coupled with the fact that, based upon Cohen's own testimony, the compensation to be derived by Briarwood from the sales of single family residential lots would be substantially similar to the multi-family project sales, causes Briarwood`s takings argument to fail. There is no"takings," and the City declines to pay Briarwood any claimed compensation as a result of the re-zoning.
¶ 47. This Court has not been persuaded by Briarwood that it has suffered a confiscation of its property.
¶ 48. The dissent would reverse and render this case, thereby substituting its judgment for that of the City of Clarksdale. In reviewing zoning matters, it is not for this Court to substitute its judgment for that of the local government. Blacklidge v. City of Gulfport, 223 So.2d 530, 533 (Miss.1969). As justification for this substitution of judgment, the dissent cites several cases for the principle that "use of property in accordance with an original zoning plan is not a material change of condition." However, the cases cited by the dissent may be distinguished, in that they lack the additional findings of fact regarding, (1) traffic congestion, (2) limited ingress and egress, (3) street construction insufficient to carry the volume of traffic, (4) inadequate drainage to handle the present development, (5) flooding, and (6) a violation of the Voting Rights Act of 1965, by excessively packing minority residents into one Ward of the city. These are all changes which occurred after the original zoning, and are matters appropriate for the concern of the City of Clarksdale.
¶ 49. The problems found as fact by the City of Clarksdale are not potential, but presently existing problems. The problems found as fact by the City of Clarksdale have only manifested themselves since the original zoning was adopted and since the area has been subjected to significant development. These problems, found to exist by the City of Clarksdale, represent a change in the character of the area. They present a change in character whose effect and impact are "fairly debatable". Matters which are "fairly debatable" are to be resolved by the local governing authority rather than by this Court. City of Biloxi v. Hilbert, 597 So.2d 1276, 1280 (Miss.1992) Because the effect and impact of these changes is "fairly debatable" the decision of the City of Clarksdale should be affirmed.

*84 WHETHER THE CIRCUIT COURT ERRED IN FINDING THAT THE ACTION OF THE BOARD OF COMMISSIONERS OF THE CITY OF CLARKSDALE DID NOT CONSTITUTE ILLEGAL "SPOT ZONING."
¶ 50. We find no merit in this argument. "There is a clear cut distinction between a validly enacted amendatory zoning ordinance and a "spot zoning" ordinance. Not all amendments which change or alter the character of a use district fall within the category of "spot zoning" as we generally understand the term. The term "spot zoning" is ordinarily used where a zoning ordinance is amended reclassifying one or more tracts or lots for a use prohibited by the original zoning ordinance and out of harmony therewith." McKibben v. City of Jackson, 193 So.2d 741, 743 (Miss.1967), McWaters v. City of Biloxi, 591 So.2d 824, 828 (Miss.1991). That clearly is not the situation in this case. The change in zoning from R-4 is neither prohibited, nor inconsistent with present use. Indeed, it should be noted that R-2 development is presently allowed under the R-4 designation.
¶ 51. THE DECISION OF THE CIRCUIT COURT OF COAHOMA COUNTY AFFIRMING THE ACTIONS OF THE CITY OF CLARKSDALE REZONING THIS PROPERTY FROM R-4 TO R-2 IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO THE APPELLANT.
SOUTHWICK, P.J., BRIDGES, IRVING, MOORE, MYERS, PAYNE, AND THOMAS, JJ., CONCUR. LEE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McMILLIN, C.J.
LEE, J., Dissenting:
¶ 52. Although I have great deference for the opinion of the majority, I must dissent. In the case at bar, neither party contends that there was a mistake in the original zoning of the property. Accordingly, my discussion will be confined to whether the Board's conclusion that there had been a change in the character of the neighborhood which justified re-zoning was supported by substantial evidence.
¶ 53. In making its decision, the Board found:
[T]here has been a substantial change in the character of the entire neighborhood, which was undeveloped agricultural farmlands when initially re-zoned to R-4 in 1974, but which has subsequently developed predominately in single family residential neighborhoods, with a clustering of multi-family housing complexes in the area. The substantial change in character of the neighborhood justifies re-zoning the Property to R-2, Single and Two Family Residential, which is in keeping with the majority of the surrounding lands closest to the property....
In essence, the Board determined that the development of "too many" multi-family housing projects constituted a change in the character of the neighborhood. That is, despite the fact that the area has developed consistent with its R-4 zoning classification, there has been a substantial change in the character of the neighborhood. I disagree.
¶ 54. In Martinson v. City of Jackson, 215 So.2d 414, 414-15 (Miss.1968), residents of the Belhaven area of the city of Jackson filed a petition to re-zone a tract of neighborhood property from A-2 residential to A-1 residential, to prohibit the construction of all dwellings larger than a two-family residence. Residents filed the petition in response to proposed development of a "New Orleans, French Quarter style town house consisting of 10 apartments...." Id. at 416. Though testimony showed that the character of the neighborhood had not changed, the Council rezoned the property to A-1. The supreme court invalidated the re-zoning, finding "the Council, to justify its order, could only point to the fact that appellants desired to use their property as the ordinance, sought *85 to be changed, authorized." Id. at 417. The court refused to find that the property owners' proposed development of an apartment complex justified the re-zoning, explaining "[w]e cannot conceive that a proposed use of the property in accordance with its classification would constitute such a material change as to meet the legal requirements, or that such question would be fairly debatable." Id. at 418.
¶ 55. In the instant case, the petitioners made no showing that the character of the neighborhood had changed so as to justify a re-zoning of the subject property. The Board did not base its decision to re-zone the property on the fact that the property was not being used in accordance with its zoning classification. Instead, the Board made its decision to re-zone the property because it was being used in accordance with its R-4 zoning classification.
¶ 56. The Board also found that the land "has subsequently developed predominately in single family residential neighborhoods, with a clustering of multi-family housing complexes in the area." Of the original ninety-acre tract, thirty-three acres were used for residential purposes, ten acres were used for the development of a nursing home, and approximately twenty-three acres were used for construction of multi-family housing projects. Development of some of the property as single family residences and some as multi-family housing projects is a use consistent with an R-4 zoning classification. The evidence in this case shows that the subject property was zoned multi-family residential and has been subjected to such use continuously. "It is also well established that the use of property in accordance with an original zoning plan is not a material change of conditions which authorizes re-zoning." Mayor and Com'rs of City of Jackson v. Wheatley Place, Inc., 468 So.2d 81, 84 (Miss.1985). See also Cloverleaf Mall, Ltd. v. Conerly, 387 So.2d 736, 740-41 (Miss.1980); Jitney-Jungle, Inc. v. City of Brookhaven, 311 So.2d 652, 654 (Miss. 1975).
¶ 57. The Board further relied upon the complaints of local residents regarding the changes in their neighborhood which have taken place since development of the multi-family housing projects. According to the Board's findings, the residential subdivisions have become "one of the more affluent neighborhoods within the City of Clarksdale occupied predominantly by African American citizens." These residents now complain of increased crime related to gang activity and feeling "tortured" in their own homes. The Board found that "disadvantaged youths, who have little to occupy their free time and excess energy, join gangs. Gangs, particularly in neighboring apartment complexes, are often at odds with each other, and `turf protection' and `gang warfare' frequently results." The Chief of Police of the Clarksdale Police Department stated that construction of additional multi-family complexes in the area would only create additional problems. Moreover, the Board noted that the Clarksdale Fire Department received a disproportionate amount of calls to the housing developments. There was also evidence presented to the Board that the housing developments caused an increase in traffic and created potential drainage problems. Finally, the Board relied upon the potential dilution of minority voting rights, recognizing that "clustering" of minorities in a single voting district would dilute their voting strength. Again, this does not change the fact that the property has been, and continues to be used in a manner consistent with its zoning classification. Therefore, the Board's decision was in error.
¶ 58. Situations such as the present one illustrate the potential problems attendant to the "change or mistake" rule used in Mississippi for determining whether zoning changes are proper. The greatest criticism of the rule is that it completely thwarts the efforts of legislative or zoning authorities where the "mistake or change" rule cannot be satisfied. There are many circumstances in which change is desirable, *86 but impossible, because of the rule. H. Goldman, Zoning Change: Flexibility v. Stability, 26 MD. L. REV. 48, 51 (1966). In the present case, the Board proposed to re-zone the property "as the greater public interest so requires." In a majority states, such a determination would be presumed valid and the scope of judicial review limited to a determination of whether the zoning change was arbitrary, capricious or unreasonable and having no substantial relation to the public health, safety or general welfare. 6 PATRICK J. ROHAN, ZONING AND LAND USE CONTROLS § 39.01[2] (1997). Unfortunately for the Board, Mississippi requires a showing of mistake or change before a re-zoning may occur.
¶ 59. The decision of the Board was not supported by substantial evidence. Use and development of property in accordance with its zoning classification does not constitute a change in the character of the neighborhood so as to warrant re-zoning. Therefore, finding this issue to have merit, the case should be reversed and rendered.
McMILLIN, C.J., JOINS THIS SEPARATE WRITTEN OPINION.