PERRY, J.,
concurring in part and dissenting in part.
I concur in the majority except as to its rejection of the challenge to District 8. I would find that Redrawn District 8 is constitutionally invalid because it is noncom-pact, does not follow consistent geographical or political boundaries, and splits a historically black Democratic community in Daytona Beach when it was feasible for it to be kept whole.
“It is this Court’s duty, given to it by the citizens of Florida, to enforce adherence to the constitutional requirements and to declare a redistricting plan that does not comply with those standards constitutionally invalid.” In re Senate Joint Resolution of Legislative Apportionment 1176, 83 So.3d 597, 607 (FIa.2012). As we stated in our prior ruling,
Because “legislative reapportionment is primarily a matter for legislative consideration and determination,” In re Apportionment Law — 1972, 263 So.2d at 799-800, this Court will defer to the Legislature’s decision to draw a district in a certain way, so long as that decision does not violate the constitutional requirements.
Id. at 608 However, I would not defer to the Legislature’s decision here because there has been a violation of the constitutional requirements for compactness and following political or geographic boundaries without tier one justification.
As previously noted,
“[T]he usual device for diluting the minority voting power is the manipulation of district lines” by either fragmenting the minority voters among several districts where a bloc-voting majority can
favor a person or political faction.”); 29 Del. Code § 804 (“Each district shall, insofar as is possible: ... (4) Not be created so as to unduly favor any person or political party.”). *899 routinely outvote them or “packing” them into one or a small number of districts to minimize their influence in adjacent districts.
Id. at 622 (citing Voinovich v. Quilter, 507 U.S. 146, 153-54, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993)). We additionally noted:
While discretion must be afforded to accommodate for well-recognized geographical boundaries, the decision to simply use any boundary, such as a creek or minor road, would eviscerate the constitutional requirement — as well as the purpose for the requirement, which is aimed at preventing improper intent.
Id. at 638.
1 would find that Redrawn District 8 has clearly been drawn with the intent to favor a political party to the detriment of a racial minority community. The effect of the Senate plan was to divide a historically black community — which is also a largely Democratic-voting community — into the surrounding community thereby diluting the voting power and even the influence of that historically black community. The district is visually non-compact, consisting of three counties, all of which are split (Volusia is split into three districts — Districts 6, 8 and 10; Marion is split into three districts — Districts 5, 8 and 11; and Lake is split into two districts — 8 and 11). Further, the northern boundary of Redrawn District 8 does not follow consistent geographical boundaries — traveling down minor roadways for just over three miles, International Speedway Boulevard (State Road 92) for 9.2 miles, another set of minor roadways for 1.6 miles, no political or geographical boundary for nearly 8 miles, another minor roadway for 3.3 miles, and then no political geographical boundary for nearly three more miles until it reaches the Volusia-Flagler County line — splitting the City of Daytona Beach. Its southern border likewise does not follow any consistent political or geographical boundaries, switching between major roads, minor roads, county lines, city boundaries, rivers, and lakes. As before, the Senate has “switched between different types of boundaries within the span of a few miles.” Id. at 656.
As asserted by the Coalition, it appears that the Legislature split Daytona Beach to dilute an African-American community and the area surrounding Bethune-Cook-man University specifically, which votes heavily Democratic, with the attendant goal of maintaining Republican performance in Redrawn Districts 6 and 8.1 agree with the Coalition’s assertions that the partisan skew is not the result of a “natural packing effect” of urban Democrats, but of systematic choices by the Legislature to favor the Republican Party. Additionally, I agree with the NAACP that the redrawn district is detrimental to black voters in Daytona Beach and that that community “accustomed to being represented by the candidate of its choice, would be stranded in a district in which it most certainly will not be able to elect its candidate of choice or one responsive to its interests and needs.”
The dividing line through Daytona Beach cuts through the heart of a concentrated black, Democratic community in Daytona Beach, dispersing those voters into the surrounding districts, which have a majority-white voting age population[21] *900 and would perform Republican (Redrawn District 6 would perform solidly Republican,[22] and Redrawn District 8 is a more competitive district, but leans Republican in its voting patterns[23]). In contrast to the composition of the surrounding areas, Daytona Beach — standing alone — would perform strongly Democratic.[24] The Senate argues that the split was made on the basis of needing to equalize the population. However, the Senate has not demonstrated that is was not feasible to use existing political and geographic boundaries here.
By finding that this Court “cannot conclude on the record ... that District 8 is facially invalid,” the majority permits the division of a community surrounding a historically black college in a way that was avoidable because that community, alone, does not comprise a majority vote. The justification seems to be that because the inclusion of the community as a whole cannot create a majority-minority district, there is no constitutional requirement that the Legislature attempt to keep it intact. This ruling contradicts the constitutional requirement that districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice. See art. Ill, § 21(a), Fla. Const.
The majority determines that “the FDP and Coalition have failed to present new facts demonstrating the Legislature redrew the plan with an improper intent.” Majority op. at 882. As I stated in my concurring opinion, “I am fearful that we have cloaked ourselves in a permissive standard of review where the Legislature need not demonstrate its adherence to each of the new constitutional mandates.” In re Senate Joint Resolution of Legislative Apportionment 1176, 88 So.3d at 693 (Perry, J., concurring). With today’s ruling, I am fearful that we have created a precedent that will preclude this community from ever being able to successfully challenge being split into two districts because it will never be “retrogressive” from this point. This ruling sends a signal that *901 it is permissible under the provisions of our constitution to divide and conquer a racial or language minority group before they are able to reach a majority voting bloc.
Because I would find that Redrawn District 8 is noncompact, does not follow consistent geographic and political bounties, and splits Daytona Beach to the detriment of black voters and diluting their minority voting power and influence, I dissent to that portion of the majority’s decision.
QUINCE, J., concurs.

. The voting-age populations of the two districts are as follows. Redrawn District 6: black VAP 10.6%; Hispanic VAP 5.6%; white VAP 81.4%. Redrawn District 8; black VAP 10.0%; Hispanic VAP 9.3%; white VAP 78.7%. Thus, contrary to the FDP’s argument, there are no impermissible diminishment con *900 cerns when compared to the appropriate benchmark district.

. The data for Redrawn District 6 is as follows: 41.8% of registered voters would be registered as Republicans, as opposed to the 36.3% who would be registered as Democrats; 50.8% of the voters who would have turned out for the 2010 general election would have been registered Republicans, as opposed to the 33.8% who would have been registered Democrats. Further, results from the 2010 gubernatorial, 2008 presidential, and 2006 gubernatorial elections confirm that Redrawn District 6 would perform Republican: 59.0% for Scott, 56.6% Senator McCain, and 59.1% for Crist, respectively.

. The data for Redrawn District 8 shows that 39.5% of registered voters would be registered as Democrats, as opposed to the 36.0% who would be registered as Republicans. On the other hand, 44.3% of the voters who would have turned out for the 2010 general election would have been registered Republicans, as opposed to the 38.2% who would have been registered Democrats. Further, results from the 2010 gubernatorial, 2008 presidential, and 2006 gubernatorial elections illustrate that Redrawn District 8 would be competitive, but would lean Republican: 52.8% for Scott, 50.4% for Obama, and 53.0% for Crist, respectively.

.The data reveals that 55.0% of registered voters in Daytona Beach would have been registered as Democrats, as opposed to the 22.4% who would be registered as Republicans. Moreover, 54.5% of the voters who would have turned out for the 2010 general election would have been registered Democrats, as opposed to the 29.5% who would have been registered Republicans. Results from the 2010 gubernatorial, 2008 presidential, and 2006 gubernatorial elections confirm that Daytona Beach would most likely perform Democratic: 61.4% for Sink, 69.2% for Obama, and 60.4% for Davis, respectively.