## VOINOVICH, GOVERNOR OF OHIO, ET AL. *v.* QUILTER, SPEAKER PRO TEMPORE OF OHIO HOUSE OF REPRESENTATIVES, ET AL.

No. 91–1618.   Argued December 8, 1992—Decided March 2, 1993

O'CONNOR, J., delivered the opinion for a unanimous Court.

*N. Victor Goodman* argued the cause for appellants. With him on the briefs were *Orla E. Collier III, Mark D. Tucker,* and *David L. Shapiro.*

*Thomas G. Hungar* argued the cause *pro hac vice* for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Starr, Assistant Attorney General Dunne, Deputy Solicitor General Roberts, Deputy Assistant Attorney General Turner, David K. Flynn,* and *Mark L. Gross.*

*Armistead W. Gilliam, Jr.,* argued the cause for appellees. With him on the briefs was *Thomas I. Atkins.*\*

---

\*Briefs of *amici curiae* urging affirmance were filed for the NAACP Legal Defense and Educational Fund, Inc., et al. by *Julius L. Chambers, Charles Stephen Ralston, C. Lani Guinier,* and *Pamela S. Karlan;* and for Congressman Louis Stokes et al. by *Abbe David Lowell* and *Jeffrey M. Wice.*

JUSTICE O'CONNOR delivered the opinion of the Court.

This is yet another dispute arising out of legislative redistricting and reapportionment. See, *e. g.*, *Growe* v. *Emison, ante*, p. 25. Today we consider whether Ohio's creation of several legislative districts dominated by minority voters violated § 2 of the Voting Rights Act of 1965, 79 Stat. 437, as amended, 42 U. S. C. § 1973.

I

Under the Ohio Constitution, the state apportionment board must reapportion electoral districts for the state legislature every 10 years. Ohio Const., Art. XI, § 1. In 1991, the board selected James Tilling to draft a proposed apportionment plan. After conducting public hearings and meeting with members of historically underrepresented groups, Tilling drafted a plan that included eight so-called majority-minority districts—districts in which a majority of the population is a member of a specific minority group. The board adopted the plan with minor amendments by a 3-to-2 vote along party lines. The board's three Republican members voted for the plan; the two Democrats voted against it. 794 F. Supp. 695, 698, 716–717 (ND Ohio 1992); App. to Juris. Statement 160a–167a, 183a.

Appellees Barney Quilter and Thomas Ferguson, the two Democratic members of the board who voted against the plan, and various Democratic electors and legislators filed this lawsuit in the United States District Court for the Northern District of Ohio seeking the plan's invalidation. They alleged that the plan violated § 2 of the Voting Rights Act of 1965, as amended, 42 U. S. C. § 1973, and the Fourteenth and Fifteenth Amendments to the United States Constitution. 794 F. Supp., at 695–696. According to appellees, the plan "packed" black voters by creating districts in which they would constitute a disproportionately large majority. This, appellees contended, minimized the total number of districts in which black voters could select their candidate of

choice. In appellees' view, the plan should have created a larger number of "influence" districts—districts in which black voters would not constitute a majority but in which they could, with the help of a predictable number of cross-over votes from white voters, elect their candidates of choice. See App. to Juris. Statement 141a–142a. Appellants, by contrast, argued that the plan actually enhanced the strength of black voters by providing "safe" minority-dominated districts. The plan, they pointed out, compared favorably with the 1981 apportionment and had the backing of the National Association for the Advancement of Colored People, Ohio Conference of Branches (Ohio NAACP). 794 F. Supp., at 706.

A three-judge District Court heard the case and held for appellees. Relying on various statements Tilling had made in the course of the reapportionment hearings, the court found that the board had created minority-dominated districts "whenever possible." *Id.*, at 698. The District Court rejected appellants' contention that §2 of the Voting Rights Act of 1965, as amended, 42 U. S. C. §1973, requires that such districts be created wherever possible. 794 F. Supp., at 699. It further held that §2 actually prohibits the "wholesale creation of majority-minority districts" unless necessary to "'remedy'" a §2 violation. *Id.*, at 701. The District Court therefore ordered the board to draft a new plan or demonstrate that it was remedying a §2 violation. *Id.*, at 702.

Judge Dowd dissented, arguing that the majority's analysis "place[d] the cart before the horse." *Id.*, at 709. In his view, §2 does not require the State to show a violation before creating a majority-minority district. Rather, the State may create any district it might desire, so long as minority voting strength is not diluted as a result. Because appellees failed to demonstrate that the 1991 plan diluted the balloting strength of black voters, Judge Dowd thought their challenge should fail. *Id.*, at 710.

The apportionment board responded by creating a record that, in its view, justified the creation of majority-minority districts. The board also adjusted the plan to correct "technical" errors that the Ohio Supreme Court had identified in its independent review of the plan. This revised 1992 plan created only five majority-black districts. App. to Juris. Statement 258a–263a. The District Court, however, was not satisfied with the board's proof. In an order issued on March 10, 1992, it held that "the [b]oard fail[ed] once again to justify its wholesale creation of majority-minority districts, thus rendering the plan, as submitted, violative of the Voting Rights Act of 1965." 794 F. Supp. 756, 757 (ND Ohio). The court then appointed a special master to prepare a redistricting plan. *Ibid.* Once again, Judge Dowd dissented. *Id.*, at 758.

Nine days later, on March 19, 1992, the District Court issued an order reaffirming its view that the creation of majority-minority districts is impermissible under § 2 unless necessary to remedy a statutory violation. App. to Juris. Statement 128a–141a. The order also restated the court's conclusion that the board had failed to prove a violation. Specifically, it noted "the absence of racial bloc voting, the [ability of black voters] to elect both black and white candidates of their choice, and the fact that such candidates ha[d] been elected over a sustained period of time." *Id.*, at 130a. In addition, the order rejected as "clever sophistry" appellants' argument that the District Court should not have invalidated the 1991 plan without finding that, under the totality of the circumstances, it diluted minority voting strength:

> "Having implemented the Voting Rights Act remedy in the absence of a violation, [appellants] suggest that we are now required to establish a violation as a prerequisite to removing the remedy. Actually, however, this task is not as difficult as it seems. The totality of circumstances reveals coalitional voting between whites and blacks. As a result, black candidates have been re-

peatedly elected from districts with only a 35% black population. Against this background, the per se requirement of the creation of majority-minority districts has a dilutive effect on black votes . . . ." *Id.*, at 141a, 142a (footnotes omitted).

The District Court further concluded that, because the board had applied the " 'remedy' intentionally" and for the purpose of political advantage, it had violated not only § 2 but the Fifteenth Amendment as well. *Id.*, at 142a–143a. Finally, the court held that the plan violated the Fourteenth Amendment because it departed from the requirement that all districts be of nearly equal population. *Id.*, at 146a–148a.

On March 31, 1992, the District Court ordered that the primary elections for Ohio's General Assembly be rescheduled. 794 F. Supp. 760 (ND Ohio). On April 20, 1992, this Court granted appellants' application for a stay of the District Court's orders, 503 U. S. 979; and on June 1, 1992, we noted probable jurisdiction, 504 U. S. 954. We now reverse the judgment of the District Court and remand only for further proceedings on whether the plan's deviation from equal population among districts violates the Fourteenth Amendment.

## II

Congress enacted § 2 of the Voting Rights Act of 1965, 42 U. S. C. § 1973, to help effectuate the Fifteenth Amendment's guarantee that no citizen's right to vote shall "be denied or abridged . . . on account of race, color, or previous condition of servitude," U. S. Const., Amdt. 15. See *NAACP* v. *New York*, 413 U. S. 345, 350 (1973). Section 2(a) of the Act prohibits the imposition of any electoral practice or procedure that "results in a denial or abridgement of the right of any citizen . . . to vote on account of race or color." Section 2(b), in relevant part, specifies that § 2(a) is violated if:

"[B]ased on the totality of circumstances, it is shown that the political processes leading to nomination or elec-

tion in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U. S. C. § 1973(b).

Section 2 thus prohibits any practice or procedure that, "interact[ing] with social and historical conditions," impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters. *Thornburg* v. *Gingles*, 478 U. S. 30, 47 (1986).

## A

In the context of single-member districts, the usual device for diluting minority voting power is the manipulation of district lines. A politically cohesive minority group that is large enough to constitute the majority in a single-member district has a good chance of electing its candidate of choice, if the group is placed in a district where it constitutes a majority. Dividing the minority group among various districts so that it is a majority in none may prevent the group from electing its candidate of choice: If the majority in each district votes as a bloc against the minority candidate, the fragmented minority group will be unable to muster sufficient votes in any district to carry its candidate to victory.

This case focuses not on the fragmentation of a minority group among various districts but on the concentration of minority voters within a district. How such concentration or "packing" may dilute minority voting strength is not difficult to conceptualize. A minority group, for example, might have sufficient numbers to constitute a majority in three districts. So apportioned, the group inevitably will elect three candidates of its choice, assuming the group is sufficiently cohesive. But if the group is packed into two districts in which it constitutes a super-majority, it will be

assured only two candidates. As a result, we have recognized that "[d]ilution of racial minority group voting strength may be caused" either "by the dispersal of blacks into districts in which they constitute an ineffective minority of voters or from the concentration of blacks into districts where they constitute an excessive majority." *Id.*, at 46, n. 11.

Appellees in this case, however, do not allege that Ohio's creation of majority-black districts prevented black voters from constituting a *majority* in additional districts. Instead, they claim that Ohio's plan deprived them of "influence districts" in which they would have constituted an influential *minority*. Black voters in such influence districts, of course, could not dictate electoral outcomes independently. But they could elect their candidate of choice nonetheless if they are numerous enough and their candidate attracts sufficient cross-over votes from white voters. We have not yet decided whether influence-dilution claims such as appellees' are viable under § 2, *Growe, ante,* at 41, n. 5; see *Gingles, supra,* at 46–47, nn. 11–12 (leaving open the possibility of influence-dilution claims); nor do we decide that question today. Instead, we assume for the purpose of resolving this case that appellees in fact have stated a cognizable § 2 claim.

## B

The practice challenged here, the creation of majority-minority districts, does not invariably minimize or maximize minority voting strength. Instead, it can have either effect or neither. On the one hand, creating majority-black districts necessarily leaves fewer black voters and therefore diminishes black-voter influence in predominantly white districts. On the other hand, the creation of majority-black districts can enhance the influence of black voters. Placing black voters in a district in which they constitute a sizeable and therefore "safe" majority ensures that they are able to elect their candidate of choice. Which effect the practice

has, if any at all, depends entirely on the facts and circumstances of each case.

The District Court, however, initially thought it unnecessary to determine the effect of creating majority-black districts under the totality of the circumstances. In fact, the court did not believe it necessary to find vote dilution at all. It instead held that § 2 prohibits the creation of majority-minority districts unless such districts are necessary to remedy a statutory violation. 794 F. Supp., at 701. We disagree. Section 2 contains no *per se* prohibitions against particular types of districts: It says nothing about majority-minority districts, districts dominated by certain political parties, or even districts based entirely on partisan political concerns. Instead, § 2 focuses exclusively on the consequences of apportionment. Only if the apportionment scheme has the *effect* of denying a protected class the equal opportunity to elect its candidate of choice does it violate § 2; where such an effect has not been demonstrated, § 2 simply does not speak to the matter. See 42 U. S. C. § 1973(b). Indeed, in *Gingles* we expressly so held: "[E]lectoral devices . . . may not be considered *per se* violative of § 2. Plaintiffs must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process." 478 U. S., at 46. As a result, the District Court was required to determine the consequences of Ohio's apportionment plan before ruling on its validity; the failure to do so was error.

The District Court's decision was flawed for another reason as well. By requiring appellants to justify the creation of majority-minority districts, the District Court placed the burden of justifying apportionment on the State. Section 2, however, places at least the initial burden of proving an apportionment's invalidity squarely on the plaintiff's shoulders. Section 2(b) specifies that § 2(a) is violated if "*it is shown*" that a state practice has the effect of denying a protected group equal access to the electoral proc-

ess. 42 U. S. C. § 1973(b) (emphasis added). The burden of "show[ing]" the prohibited effect, of course, is on the plaintiff; surely Congress could not have intended the State to prove the invalidity of its own apportionment scheme. See *Gingles*, 478 U. S., at 46 (plaintiffs must demonstrate that the device results in unequal access to the electoral process); *id.*, at 49, n. 15 (plaintiffs must "prove their claim before they may be awarded relief"). The District Court relieved appellees of that burden in this case solely because the State had created majority-minority districts. Because that departure from the statutorily required allocation of burdens finds no support in the statute, it was error for the District Court to impose it.

Of course, the federal courts may not order the creation of majority-minority districts unless necessary to remedy a violation of federal law. See *Growe, ante*, at 40–41. But that does not mean that the State's powers are similarly limited. Quite the opposite is true: Federal courts are barred from intervening in state apportionment in the absence of a violation of federal law precisely because it is the domain of the States, and not the federal courts, to conduct apportionment in the first place. Time and again we have emphasized that "'reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court.'" *Growe, ante*, at 34 (quoting *Chapman v. Meier*, 420 U. S. 1, 27 (1975)). Accord, *Connor v. Finch*, 431 U. S. 407, 414 (1977) ("We have repeatedly emphasized that 'legislative reapportionment is primarily a matter for legislative consideration and determination'" (quoting *Reynolds v. Sims*, 377 U. S. 533, 586 (1964))). Because the "States do not derive their reapportionment authority from the Voting Rights Act, but rather from independent provisions of state and federal law," Brief for United States as *Amicus Curiae* 12, the federal courts are bound to respect the States' apportionment choices unless those choices contravene federal requirements. Cf. *Katzenbach v. Morgan*,

384 U. S. 641, 647–648 (1966) ("Under the distribution of powers effected by the Constitution, the States establish qualifications for voting for state officers" and such qualifications are valid unless they violate the Constitution or a federal statute).

Appellees' complaint does not allege that the State's conscious use of race in redistricting violates the Equal Protection Clause; the District Court below did not address the issue; and neither party raises it here. Accordingly, we express no view on how such a claim might be evaluated. We hold only that, under § 2 of the Voting Rights Act of 1965, as amended, 42 U. S. C. § 1973, plaintiffs can prevail on a dilution claim only if they show that, under the totality of the circumstances, the State's apportionment scheme has the effect of diminishing or abridging the voting strength of the protected class.

## C

In its order of March 19, 1992, the District Court found that the 1992 plan's creation of majority-minority districts "ha[d] a dilutive effect on black votes." App. to Juris. Statement 141a. Again we disagree.

In *Thornburg* v. *Gingles, supra,* this Court held that plaintiffs claiming vote dilution through the use of multimember districts must prove three threshold conditions. First, they must show that the minority group " 'is sufficiently large and geographically compact to constitute a majority in a single-member district.' " Second, they must prove that the minority group " 'is politically cohesive.' " Third, the plaintiffs must establish " 'that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate.' " *Growe, ante,* at 40 (quoting *Gingles, supra,* at 50–51). The District Court apparently thought the three *Gingles* factors inapplicable because Ohio has single-member rather than multimember districts. 794 F. Supp., at 699 (*"Gingles'* preconditions are not applicable to the apportionment of single-member districts"). In *Growe,*

however, we held that the *Gingles* preconditions apply in challenges to single-member as well as multimember districts. *Ante*, at 40–41.

Had the District Court employed the *Gingles* test in this case, it would have rejected appellees' §2 claim. Of course, the *Gingles* factors cannot be applied mechanically and without regard to the nature of the claim. For example, the first *Gingles* precondition, the requirement that the group be sufficiently large to constitute a majority in a single district, would have to be modified or eliminated when analyzing the influence-dilution claim we assume, *arguendo*, to be actionable today. *Supra*, at 154. The complaint in such a case is not that black voters have been deprived of the ability to constitute a *majority*, but of the possibility of being a sufficiently large *minority* to elect their candidate of choice with the assistance of cross-over votes from the white majority. See *ibid.* We need not decide how *Gingles*' first factor might apply here, however, because appellees have failed to demonstrate *Gingles*' third precondition—sufficient white majority bloc voting to frustrate the election of the minority group's candidate of choice. The District Court specifically found that Ohio does not suffer from "racially polarized voting." 794 F. Supp., at 700–701. Accord, App. to Juris. Statement 132a–134a, and n. 2, 139a–140a. Even appellees agree. See Tr. of Oral Arg. 25. Here, as in *Gingles*, "in the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Gingles*, 478 U. S., at 49, n. 15. The District Court's finding of a §2 violation, therefore, must be reversed.

### III

The District Court also held that the redistricting plan violated the Fifteenth Amendment because the apportionment board intentionally diluted minority voting strength for political reasons. App. to Juris. Statement 142a–143a.

This Court has not decided whether the Fifteenth Amendment applies to vote-dilution claims; in fact, we never have held any legislative apportionment inconsistent with the Fifteenth Amendment. *Beer* v. *United States*, 425 U. S. 130, 142–143, n. 14 (1976). Nonetheless, we need not decide the precise scope of the Fifteenth Amendment's prohibition in this case. Even if we assume that the Fifteenth Amendment speaks to claims like appellees', the District Court's decision still must be reversed: Its finding of intentional discrimination was clearly erroneous. See *Mobile* v. *Bolden*, 446 U. S. 55, 62 (1980) (plurality opinion); *id.*, at 101–103 (WHITE, J., dissenting); *id.*, at 90–92 (STEVENS, J., concurring in judgment); *id.*, at 80 (BLACKMUN, J., concurring in result).

The District Court cited only two pieces of evidence to support its finding. First, the District Court thought it significant that the plan's drafter, Tilling, disregarded the requirements of the Ohio Constitution where he believed that the Voting Rights Act of 1965 required a contrary result. App. to Juris. Statement 142a–143a, n. 8. But Tilling's preference for federal over state law when he believed the two in conflict does not raise an inference of intentional discrimination; it demonstrates obedience to the Supremacy Clause of the United States Constitution. Second, the District Court cited Tilling's possession of certain documents that, according to the court, were tantamount to "a road-map detailing how [one could] create a racial gerrymander." *Id.*, at 143a, n. 9. Apparently, the District Court believed that Tilling, a Republican, sought to minimize the Democratic Party's power by diluting minority voting strength. See *ibid.* The District Court, however, failed to explain the nature of the documents. Contrary to the implication of the District Court opinion, the documents were not a set of Republican plans for diluting minority voting strength. In fact, they were not even created by Tilling or the Republicans. They were created by a Democrat who, concerned about possible Republican manipulation of apportionment,

set out the various types of political gerrymandering in which he thought the Republicans might engage. App. 99–100. That Tilling possessed documents in which the opposing party speculated that he might have a discriminatory strategy does not indicate that Tilling actually had such a strategy. And nothing in the record indicates that Tilling relied on the documents in preparing the plan.

Indeed, the record demonstrates that Tilling and the board relied on sources that were wholly unlikely to engage in or tolerate intentional discrimination against black voters, including the Ohio NAACP, the Black Elected Democrats of Ohio, and the Black Elected Democrats of Cleveland, Ohio. Tilling's plan actually incorporated much of the Ohio NAACP's proposed plan; the Ohio NAACP, for its part, fully supported the 1991 apportionment plan. 794 F. Supp., at 726–729; App. to Juris. Statement 164a–167a, 269a–270a. Because the evidence not only fails to support but also directly contradicts the District Court's finding of discriminatory intent, we reverse that finding as clearly erroneous. In so doing, we express no view on the relationship between the Fifteenth Amendment and race-conscious redistricting. Cf. *United Jewish Organizations of Williamsburgh, Inc.* v. *Carey*, 430 U. S. 144, 155–165 (1977) (plurality opinion). Neither party asserts that the State's conscious use of race by itself violates the Fifteenth Amendment. Instead, they dispute whether the District Court properly found that the State intentionally discriminated against black voters. On that question, we hold only that the District Court's finding of discriminatory intent was clear error.

## IV

Finally, the District Court held that the plan violated the Fourteenth Amendment because it created legislative districts of unequal size. App. to Juris. Statement 146a–148a. The Equal Protection Clause does require that electoral districts be "of nearly equal population, so that each

person's vote may be given equal weight in the election of representatives." *Connor*, 431 U. S., at 416. But the requirement is not an inflexible one.

> "[M]inor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State. Our decisions have established, as a general matter, that an apportionment plan with a maximum population deviation under 10% falls within this category of minor deviations. A plan with larger disparities in population, however, creates a prima facie case of discrimination and therefore must be justified by the State." *Brown* v. *Thomson*, 462 U. S. 835, 842–843 (1983) (internal quotation marks and citations omitted).

Here, the District Court found that the maximum total deviation from ideal district size exceeded 10%. App. to Juris. Statement 148a. As a result, appellees established a prima facie case of discrimination, and appellants were required to justify the deviation. Appellants attempted to do just that, arguing that the deviation resulted from the State's constitutional policy in favor of preserving county boundaries. See Ohio Const., Arts. VII–XI. The District Court therefore was required to decide whether the "plan 'may reasonably be said to advance [the] rational state policy'" of preserving county boundaries "and, if so, 'whether the population disparities among the districts that have resulted from the pursuit of th[e] plan exceed constitutional limits.'" *Brown*, *supra*, at 843 (quoting *Mahan* v. *Howell*, 410 U. S. 315, 328 (1973)). Rather than undertaking that inquiry, the District Court simply held that total deviations in excess of 10% cannot be justified by a policy of preserving the boundaries of political subdivisions. Our case law is directly to the contrary. See *Mahan* v. *Howell*, *supra* (upholding total deviation of over 16% where justified by the rational objective of

preserving the integrity of political subdivision lines); see also *Brown* v. *Thomson, supra.* On remand, the District Court should consider whether the deviations from the ideal district size are justified using the analysis employed in *Brown, supra,* at 843–846, and *Mahan, supra,* at 325–330.

The judgment of the District Court is reversed, and the case is remanded for further proceedings in conformity with this opinion.

*So ordered.*