William WRIGHT, et. al., Plaintiffs,

v.

CITY OF ALBANY, et. al., Defendants.

No. 1:03–CV–148–1(WLS).

United States District Court,
M.D. Georgia,
Albany Division.

Dec. 24, 2003.

Neil T. Bradley, Laughlin McDonald, Meredith Elaine Barnes–Bell, Atlanta, GA, for William Wright, Emma A.D. Branch–Davenport, Loreen Jackson, Constance M. Burkes, John Burr, Bishop, plaintiffs.

Gregory L. Fullerton, Louis E. Hatcher, Albany, GA, for Jo Ann Pope.

Charles Nathan Davis, Donald A. Sweat, Albany, GA, for City of Albany, Georgia, Tommy Coleman, In His Official Capacity as Mayor of the City of Albany, Jon Howard, In His Official Capacity as Member of the Board of Commissioners of the City of Albany, Henry Mathis, In His Official Capacity as Member of the Board of Commissioners of the City of Albany, Arthur Williams, In His Official Capacity as Member of the Board of Commissioners of the City of Albany, Bo Dorough, In His Official Capacity as Member of the Board of Commissioners of the City of Albany, Bob Langstaff, Jr., In His Official Capacity as Member of the Board of Commissioners of the City of Albany, David Williams, In His Official Capacity as Member of the Board of Commissioners of the City of Albany, Carolyn Hatcher, In Her Official Capacity as Supervisor of Elections for Dougherty County, Georgia, defendants.

## ORDER

SANDS, Chief Judge.

The right of its citizens to vote is an indispensable component of our constitution and representative form of government. It is equally important that the weight of votes among the citizens of the same governmental subdivision be equal. This long-standing constitutional principle is applicable to elections for our national officials and to those for the states and their political subdivisions.

The United States Constitution requires that a census is taken of the national population every ten years, the last in the year

2000. Following each such census the U.S. House of Representatives, limited to 435 members, is reapportioned. That is, the number of representatives are apportioned among the states so that each representative represents approximately an equal number of citizens, provided further that each state has at least one representative. As a result, it is not unusual that some states gain in the number of U.S. Representatives while others have their representation reduced. For instance, as a result of the 2000 census, Georgia's number of representatives increased from 11 to 13, while New York's number of representatives was reduced from 31 to 29. *Congressional Reapportionment,* www.censusdata/reapportionment.

The state legislatures have the responsibility of drawing up the actual districts to be represented by each representative. These districts, among other things, must comply with the aforementioned requirement that the votes of the voters within the districts be equal, that is, the district plans must comply with the one-person, one-vote requirement of the Fourteenth Amendment.

Political subdivisions of the state, i.e., cities and counties, etc., must also conform to the one-person, one-vote requirement. Further, single representative districts of the political subdivisions are preferred. That brings us to the instant case, the voting districts of the City of Albany, Georgia.

The last and existing redistricting plan for the City of Albany was enacted in 1992. The City Commission, the City's governing body responsible for redistricting, has not enacted an approved new redistricting plan although almost three years have passed since the 2000 census. This failure resulted in the 1992 plan still being in place at the time for election of the mayor and Commissioners for Districts/Wards 1, 4, and 6 of the city's commission scheduled for November 4, 2003, notwithstanding the 2000 census and the requirement that a new plan be drawn and put into place.

Thus, on September 24, 2003, Plaintiffs, voters residing in three of six voting districts or wards of the City of Albany, Georgia, filed a complaint alleging that the City's voting districts are malapportioned in violation of the Fourteenth Amendment and the Voting Rights Act. They contend that the ideal district should consist of 12,823 voters. According to Plaintiffs, Wards 1, 4, and 6, as currently apportioned consist of 12,730, 13,318 and 10,618 voters, respectively, and the other wards are also malapportioned. They further allege that the six wards have a total deviation of 52.8% from the ideal.

By answer and stipulation, the Defendants admitted, and the parties agreed that the districts are malapportioned as alleged, and that the districts are in violation of the one person, one vote rule and sections 2 and 5 of the Voting Rights Act. (Tabs 27, 31); *See Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).[1] While no formal order finding in favor of the Plaintiffs was entered, the Court ordered the parties, including Plaintiff–Intervenor Adams, to submit joint or individual redistricting plans or maps. (Tab 26). Immediately prior to a status conference on the status of the proposed plans, Plaintiff–Intervenor Pope filed a motion to amend her motion to intervene, which was followed about a week later by the filing of Plaintiffs–Intervenors Studl, Studl and Jordan's motion to intervene. (Tab 36, 46). The

---

**1.** No party or intervenor has contended or alleged that the districts are not malapportioned.

Court allowed all moving parties to intervene in the case.[2] (Tab 51).

By the time of the hearing on the proposed redistricting plan held on November 14, 2003, the various parties had submitted opposing maps. Plaintiff–Intervenor Adams submitted a map drawn by Linda D. Meggers, Director of the Legislative Reapportionment Services Office of the Georgia General Assembly, entitled "Option Albany1–LDM" (hereinafter "Meggers1 or Meggers"). Plaintiff Wright submitted a map entitled "Albany–Wright" (hereinafter "Wright"). Plaintiff–Intervenor Pope submitted a plan entitled "Albany–Pope" which the parties concede is essentially the plan submitted by the City to the U.S. Department of Justice for approval (hereinafter "Pope or Legislative"). Lastly, Plaintiff–Intervenors Studl, Studl and Jordan (hereinafter "Studl") submitted a plan entitled "Albany2–1dm" (hereinafter "Studl")[3].

On or about October 15, 2003, Ms. Meggers was contacted by Plaintiffs and asked to draw a proposed redistricting map that complied with "one-person, one-vote" jurisprudence.[4] (Tab 33). On October 20, 2003, Ms. Meggers delivered to Plaintiffs her plan, Meggers1. (Tab 33). For reasons that were not apparent to the Court at that time, Plaintiffs rejected Ms. Meggers' plan and drafted their own plan, the Wright plan. In the meantime, Plaintiff–Intervenor Adams received a copy of the Meggers1 plan, approved of it, adopted it, and submitted the Meggers1 plan on October 24, 2003, as his proposed plan. (Tabs 32, 33).

On October 28, 2003, Plaintiffs filed their own plan, the Wright plan, and a brief in support of the request that the Court adopt the plan. (Tab 34). Specifically, Plaintiffs argued that the Wright plan cured two deficiencies in the Meggers1 plan. First, Plaintiffs argued that their plan has a lower total deviation of .56% as opposed to a deviation of 1.91% in the Meggers plan.[5] (Tab 34). Second, the Wright plan cured the defect in the Meggers1 plan which allegedly placed District 3 incumbent commissioner Arthur Williams in District 6, assuming his residence is on West Lincoln Avenue.

Intervenors–Plaintiffs Pope and Studl submitted their plans between October 31, 2003, and November 12, 2003. (Tabs 36, 48). It is clear from Pope's initial pleadings and the arguments of counsel made during the November 5, 2003, hearing, that Pope's plan is essentially the plan

---

**2.** It should be noted and recalled that this Court *sua sponte* noticed a public hearing on the original parties', Plaintiffs and City Defendants, proposed consent order. This was done to insure that the public and all interested parties were aware of the litigation and the initial parties' proposed resolution. The public interest in this litigation is paramount.

**3.** Informally and at times, the parties called this plan the "Meggers 2" plan which gave the Court the impression that Ms. Meggers played a part in drawing the plan. The Court has since been informed by Ms. Meggers that she had no role in drafting the Studl plan. Apparently, the Studl Plaintiffs utilized Ms. Meggers Albany1–LDM plan as a benchmark in formulating their plan and called it the Albany2–1dm plan.

**4.** At one of the early hearings, Plaintiffs and Defendants discussed utilizing the skills of Ms. Meggers in drawing a proposed plan. All of the parties involved at that time agreed that Ms. Meggers is imminently qualified to act as an expert in this case as she has appeared in numerous redistricting cases as an expert over the years. For a list of cases in which Ms. Meggers has appeared in as an expert, see Tab 33.

**5.** The Supreme Court has created a "safe harbor" in regards to deviations. While the deviation is an important factor for the Court to consider, anything less 10% is within the "safe harbor." *Voinovich v. Quilter,* 507 U.S. 146, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993).

adopted by the Defendants, the City Commission, during the Spring of 2003, and ultimately submitted to the U.S. Department of Justice, but was later withdrawn. (Tabs 36, 39). Plaintiffs' argued, and Defendants' essentially conceded, that it would be inappropriate for the Court to consider Pope's plan because it was the legislative plan adopted by the City and ultimately withdrawn from consideration by the Justice Department.[6] (Tab 39). In response to the overwhelming criticism of Pope's plan, Pope filed an amended motion to intervene which purported to have attached to it Exhibits "D" and "E" which comprised a new plan entitled the "November Plan." (Tab 44). A review of the case file reveals that the November Plan was not in fact filed with the amended motion to intervene but apparently was served on the other parties. (Tab 44). The November Plan was entered into the record at the November 14, 2003, hearing as Pope's Exhibit 3. Even so, the Plaintiffs continued to criticize the November Plan, apparently on the grounds that it is virtually identical to Pope's first plan, or the Legislative Plan. (Tab 45).

The Studl Plan was modeled after the Meggers1 plan, and as with the Wright Plan, sought to cure the alleged deficiency of the Meggers1 plan which placed District 3 incumbent Arthur Williams in District 6, assuming a West Lincoln Avenue residence for Williams. The Studl Plan moved the southwest line of District 3 further south and adjusted the eastern border of the district to make this change workable statistically.

On November 14, 2003, the Court held a hearing on the proposed plans, received evidence and heard arguments of counsel. From the outset all of the parties accepted Ms. Meggers as an expert in legislative redistricting. An analysis of the arguments of counsel, and for the most part, the evidence, reveal that the parties agree that the Meggers1 plan complies with the one-person, one-vote standard of Section 5.

Plaintiff Wright argued, as alluded to previously, that the Meggers1 Plan placed District 3 commissioner Arthur Williams ("Williams") in District 6. According to Wright, this alleged fatal defect with the Meggers1 plan caused him to develop and propose his own plan despite Wright's initial desire to retain Meggers as an expert for the Plaintiffs. Besides resolving the immediate problem with Williams, the Wright plan contained a lower overall standard deviation of .56%.[7] As a result of making these changes, the Wright plan adjusted the map in effect to create what is described as five majority black voting districts and one majority white voting district.[8] It became apparent as the testimony and evidence progressed that an un-

6. Specifically, Plaintiffs argued that if the court adopted the Pope or Legislative plan, it would require that the Court's order be precleared with the Justice Department pursuant to Section 4 of the Voting Rights Act. *See,* Tab 45, *citing, McDaniel v. Sanchez,* 452 U.S. 130, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981). Plaintiffs correctly pointed out that such preclearance would further extend the remedial phase of this litigation.

7. See footnote 5, *supra.*

8. In considering Plaintiffs' (Wright's) plan, as well as the others, at the outset it should be reemphasized that the matter of redistricting is one primarily for the relevant legislative body, here the Board of City Commissioners.

It is understood that such redistricting and plans therefor are essentially political in nature. Thus decisions and proposals are often politically driven and reflective of the relative power and influence of the elected officials making the decisions. The Court has no role to play in such political deliberations so long as they do not run afoul of constitutional prohibitions or statutory limitations such as those imposed under the Voting Rights Act. Therefore, judicial involvement occurs only when one of these boundaries is exceeded or where the legislative body fails to act in a timely fashion. It is the latter that brings the instant case into this Court. Plaintiffs allege, and Defendants agree, Albany's voting districts are malapportioned and the Commis-

derlying issue for the litigants was whether the Court should adopt a plan that created a 4–2 majority black voting districts (the Meggers1, Pope, and Studl plans) as opposed to a 5–1 majority black voting districts (the Wright plan).

The Court realizes that all the parties in this case are trying to use this litigation to promote their various, and often, conflicting political and redistricting agendas. Early on, the Court was pleased to see Plaintiffs, Adams and Defendants agree to use Ms. Meggers as an expert to draw a proposed redistricting plan. As noted previously, Ms. Meggers is a nationally known redistricting expert with excellent credentials and an impeccable reputation. She was recognized by a federal three judge panel as a redistricting expert as early as 1982 and as recently as 2003 by the U.S. Supreme Court.[9] *Busbee v. Smith,* 549 F.Supp. 494 (D.D.C.1982); *Georgia v. Ashcroft,* 539 U.S. 461, 123 S.Ct. 2498, 156 L.Ed.2d 428 (2003). There is no evidence from any of the parties that Meggers has any political interest in the outcome of this case. Meggers comes before this Court without motive, while all of the parties, Plaintiffs, Defendants and Intervenors, come before this Court with at least some apparent political and social agendas.

Even so, the issue of Williams' residence poses at first blush a legitimate criticism of the Meggers1 plan. One of the factors the Court should consider in evaluating proposed redistricting plans is whether the plan places incumbents in the same district. *Johnson v. Miller,* 922 F.Supp. 1556

(S.D.Ga.1995). In reality, the injection of the issue in this case is a result of the murky political landscape of Albany city politics and a pretext by Plaintiffs to draw a redistricting map more to their liking.

The "Williams problem" arises from the fact that on his notice of candidate affidavit, Williams lists two addresses for his residence, 518 Holloway Avenue and 1408 West Lincoln Avenue. (Studl Ex. 3). Under the 1992 voting map, the benchmark plan, both addresses were located in District 3. (City Ex. 4). The problem arises in this litigation because the Meggers1 plan places the southwestern/northwestern boundary between Districts 3 and 6 down the middle of West Lincoln Avenue. Plaintiffs allege that one of Williams' apparent residences, 1408 West Lincoln, was on the south side of West Lincoln and, therefore, located in District 6. Meggers has subsequently confirmed that 1408 West Lincoln Avenue lies in District 6 as drawn in the Meggers1 plan. (Meggers Tel Conf., December 15, 2003).

At the hearing on November 14, 2003, the various parties questioned Williams at length about his residence. A copy of Williams' voter registration work sheet was also introduced into evidence in an effort to establish Williams' actual residence. (Studl Ex. 4). The voter registration form, completed in 1963, listed Williams' residency address as 518 Holloway. Throughout the direct and cross examination, the various parties made repeated efforts to force Williams to commit to one address or the other.[10] Finally,

---

sion has not developed and enacted an approved plan. Thus, as a result of the initial litigation, it has devolved to the Court to cure the violation. However, the Court may not do so in the same politically freewheeling way that the legislative body could have, but must follow a highly restrictive course designed solely to meet the constitutional requirements and not to foster the political agenda of any party.

**9.** Meggers has recently been appointed by the Court as the Court's independent expert in the case of *Knighton v. Dougherty County,* 1:02–CV–130–2 (WLS).

**10.** After examining all of the evidence, it is obvious that the various parties had varying reasons for trying to get Williams to commit to one address over the other. Commitment to one address as opposed to the other, bene-

after repeated ambiguous answers, Williams stated, "My residence is 518 Holloway." (Nov. 14, 2003, Tr.).

According to Plaintiff Wright, the Wright plan was developed as a direct result of the Meggers1 plan which put Williams' Lincoln Avenue address in District 6. The Wright plan, however, remedied the Lincoln Avenue problem by redrawing it back into District 3, but the Wright plan at the same time placed the Holloway address in District 6. In other words, the Meggers1 plan placed one of Williams' addresses in District 3 (Holloway) and the other in District 6 (West Lincoln), while the Wright plan, by alternating the addresses, did the same. That is, it placed the West Lincoln Avenue address in District 3, while placing the Holloway address in District 6. Therefore, Wright's objection to the Meggers1 plan because it places Williams in District 6 is ultimately without merit because it does not solve the Williams problem without his commitment to one of his alleged residences (West Lincoln Avenue), and is more reasonably viewed as a pretext for Plaintiffs to justify the drawing of a map that more closely achieves their political objectives.

On December 15, 2003, the Court held an *exparte* telephone conference with Ms. Meggers.[11] (Tel.Conf. Tr.). The Court asked Ms. Meggers whether 1408 West Lincoln is in District 6, as alleged by Plaintiffs, in the Meggers1 plan and if so, whether she could adjust her map to place 1408 West Lincoln in District 3. Ms. Meggers explained that 1408 West Lincoln is in

District 6 as drawn in the Meggers1 plan. Meggers explained, however, that with virtually no statistical effect, she could adjust the map to include 1408 West Lincoln, along with 518 Holloway, in District 3. The new map (hereinafter "Albany4–LDM or Meggers4") is drawn to include the 72 people in the 1400 block of West Lincoln in District 3.

The Meggers4 plan, with minor changes from Meggers1, alleviates the main stated objection that Plaintiffs had to the Meggers1 plan. Considering that Williams' testimony was questionable, the Meggers4 map relieves the Court of the necessity of having to make a factual determination as to Williams' legal residence without any substantial impact on the plan arrived at.[12] The issue of Williams' residency is left for another day and perhaps another court, if it is ultimately an issue at all. By addressing and dispensing with the main stated objection to the Meggers1 plan, the Court can now examine the proposed plans and compare how they withstand the standards this Court must apply in developing redistricting plans.

### DISCUSSION

■■■ Court ordered redistricting plans are held to higher standards than those developed by legislative bodies. *Chapman v. Meier*, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975). A Court ordered plan must be free from any discrimination and must meet "special standards . . . of racial fairness." *Upham v. Seamon*, 456 U.S. 37, 39, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982);

fitted one party's argument at the expense of the other party's argument.

11. The Court obtained permission on the record from the parties for the Court to speak with Ms. Meggers *exparte*. Even so, the telephone conference with Ms. Meggers was held on the record and taken down by the Court's reporter.

12. On the one hand, Williams testified that the Meggers1 map placed him in District 6, but on the other hand testified that his residence was at 518 Holloway which is in District 3 of the Meggers1 map.

*Roman v. Sincock,* 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964). Such plans, absent a compelling reason, must use single member districts. *Meier,* 420 U.S. at 21, 95 S.Ct. 751.

■ Court plans must also contain only minor, or *de minimis,* population deviations. *Meier,* 420 U.S. at 27, 95 S.Ct. 751. The Supreme Court, however, has approved population deviations as high as 16.4%. *Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973). "The burden is on the District Court to elucidate the reasons necessitating any departure from the goal of population equality, and to articulate clearly the relationship between the variance and the state policy furthered." *Id.* at 24, 95 S.Ct. 751. Even so "a 'safe harbor' exists for legislatively implemented plans achieving less than a 10% deviation. *See Voinovich v. Quilter,* 507 U.S. 146, 161, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) (noting that a plan with a maximum deviation under 10% is generally considered to fall within the category of minor deviations)." *Colleton County Council v. McConnell,* 201 F.Supp.2d 618, 631 (D.S.C.,2002)

■ In drawing or adopting redistricting plans, the Court must also comply with Sections 2 and 5 of the Voting Rights Act. "[T]he court must comply with the racial-fairness mandates of § 2 of the Voting Rights Act, 42 U.S.C.A. § 1973, and the purpose-or-effect standards of § 5 of the Voting Rights Act, 42 U.S.C.A. § 1973c. *See Abrams v. Johnson,* 521 U.S. 74, 90, 96, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997)." *Colleton County Council v. McConnell.* 201 F.Supp.2d 618, 628 (D.S.C.2002). Section 2 prohibits an election plan which "[d]ivid[es] the minority group among various districts so that it is a majority in none may prevent the group from electing its candidate of choice: If the majority in each district votes as a bloc against the minority candidate, the frag-mented minority group will be unable to muster sufficient votes in any district to carry its candidate to victory." *McConnell,* 201 F.Supp.2d at 633. Section 2 also prohibits "packing" where minority voters are all placed in one single member district. *Id.*

■ The Court must also consider race in determining whether its plan or a proposed plan complies with Section 5. Section 5 prevents the implementation of proposed plans that have a retrogressive purpose or effect on minority voting strength. *Reno v. Bossier Parish School Board,* 528 U.S. 320, 335, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000); *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976). A three-judge panel sitting in South Carolina recently stated:

Although they share the goal of addressing the evils of racial discrimination, § 5 differs in important respects from § 2 of the Voting Rights Act. First, § 2 applies to *all* states, whereas § 5 applies only to those states, such as South Carolina, which have the worst reputation for historical and ongoing discrimination against blacks. Second, by requiring the creation of majority-minority districts where vote dilution under the *Gingles* test would occur, § 2 looks beyond the status quo to ensure that a redistricting plan affords blacks an equal opportunity to elect the representatives of their choice as white voters enjoy. *See* 42 U.S.C.A. § 1973(b); *Gingles,* 478 U.S. at 47, 106 S.Ct. 2752. Section 5, in contrast, maintains the status quo. It only prevents "backsliding" in those jurisdictions subject to its requirements by prohibiting the implementation of any proposed voting change that has been enacted for a retrogressive purpose, *see Reno v. Bossier Parish Sch. Bd.,* 528 U.S. 320, 335, 120 S.Ct. 866, 145 L.Ed.2d 845 (2000) ("*Bossier Parish*

*II* "), or that has a retrogressive effect on minority voting strength, *see Beer,* 425 U.S. at 141, 96 S.Ct. 1357. Section 5 requires no separate inquiry into the *Gingles* factors to determine whether an opportunity district must be created, but "mandates that the minority's [existing] *opportunity* to elect representatives of its choice not be diminished, directly or indirectly, by the State's actions." *Bush v. Vera,* 517 U.S. 952, 983, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996).

*McConnell,* 201 F.Supp.2d at 634–635. In order to measure a plan's retrogressive effect, the Court must compare the new plan to the most recent legally enforceable plan, i.e., the "benchmark" plan. *Id.* at 635. In the present case, the 1992 plan is the benchmark plan to which the Court will compare to the proposed plans.

█ The requirements of the Voting Rights Act can bring it into conflict with the limitations imposed upon the courts by the Equal Protection Clause. "The end result is that the Voting Rights Act must always be considered in tandem with the strictures of the Equal Protection Clause, with the latter operating as a constant limit upon the degree to which state legislatures—and this court acting in its remedial capacity—can engage in race-based districting to achieve the goals of the Voting Rights Act." *Id.* at 636. As a general matter, race-based classifications are subjected to strict scrutiny, and will only be allowed if the state action is narrowly tailored to achieve a compelling state interest. *See, e.g., Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 224, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).

█ Even though race is a consideration under the Voting Rights Act, a strict scrutiny analysis is not necessary if race is just one factor in reapportionment. Justice O'Conner stated:

[S]o long as they do not subordinate traditional districting criteria to the use of race for its own sake or as a proxy, States may intentionally create majority-minority districts and may otherwise take race into consideration, without coming under strict scrutiny. Only if traditional districting criteria are neglected and that neglect is predominately due to the misuse of race does strict scrutiny apply.

*Bush v. Vera,* 517 U.S. 952, 993, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (O'Connor, J., concurring). Another three-judge panel summarized a list of identifying factors that often reveal predominately race-based plans that violate the Equal Protection Clause.

They are: using land bridges in a deliberate attempt to bring black population into a district (*Miller*); use of sophisticated computers with block-by-block racial data (*Bush*); evidence of demographer's ... purpose in drawing the challenged lines (*Shaw* and *Miller*); creation of new, non-compact and oddly shaped districts beyond those necessary to avoid retrogression (*Miller* and *Shaw*); creation of districts that exhibit disregard for city limits, local election precincts, and voting tabulation districts (*Bush*); districts that wind "in snake-like fashion" until enough black neighborhoods are included to create a black-majority district (*Shaw I* [*Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993)]); establishment of a fixed percentage of minority population with[in] a district ... to establish a safe black district (*Bush*); evidence that race or percentage of race could not be compromised (*Shaw II* [*Shaw v. Hunt,* 517 U.S. 899, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996)]); statements by legislators indicating that race was the predominant factor in creating the challenged districts (*Miller*); and statements made in submission for preclearance to the Department of Justice that

its purpose was to comply with the dictates of the Department's rejection letter (*Shaw II*).

*Smith v. Beasley*, 946 F.Supp. 1174, 1207 (D.S.C.1996).

With these overall considerations in mind, the Court should then apply the traditional state districting principles. *McConnell*, 201 F.Supp.2d at 646–47. The principles include contiguous districts, compact districts, respect for precinct lines, communities of interest and other political boundaries. *Id.* Also, new redistricting maps should reflect the least change, when the least amount of change does not conflict with governing federal principles. *Id.*; 66 Fed.Reg. at 5413 (January 18, 2001). Another less compelling concern is often called "protecting incumbents" which is the avoidance of placing incumbents in the same district. *Johnson v. Miller*, 922 F.Supp. 1556, 1565 (S.D.Ga. 1995) (because incumbency protection is "inherently" political it is subservient to other traditional concerns).

### THE PROPOSED PLANS

The only real objections to the Meggers1 plan were made by Plaintiffs after they asked Meggers to develop a redistricting plan that complied with the standard of one-person, one-vote. It represents the least change from the benchmark plan, as compared to either the Studl plan or the Wright plan.[13] As noted previously, the Pope plans, no matter how they are denominated or what they are called, are essentially the plan previously adopted by the City Commission but not precleared, and therefore, remains subject to preclearance by the Justice Department, if adopted. *McDaniel v. Sanchez*, 452 U.S. 130, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981). Since preclearance could take a number of months, even with the Court's imprimatur, and delay the pending election even further, the Court will not give the Pope plans further consideration.

According to Plaintiff Wright, the Meggers1 plan is defective in that it placed incumbent Williams in Ward 6 and that Ward 4 was retrogressive. The Court has already addressed the evidence as it relates to Williams' residence for voting purposes. Even though the evidence supports a finding that Williams' residence is 518 Holloway, the Court asked Ms. Meggers to modify her map. Meggers submitted two additional proposed maps, Albany3–LDM and Albany 4–LDM (hereinafter "Meggers3" and "Meggers4")[14]. Both maps cure the original "Williams problem." The Meggers3 plan requires moving the census block containing 1408 West Lincoln into District 3 and splitting the Carver Gym precinct, south of Oglethorpe and east of Jefferson, into District 6 in order to keep the district under one percent deviation, with an overall deviation of 1.72 percent. The Meggers4 plan just moves the census block in question from District 6 to District 3. The change would give District 6 a

13. The Studl intervenors argued that the Meggers1 plan was the best plan. The only difference between their plan and the Meggers1 plan is that the Studl plan accounted for the possibility that Williams lived at 1408 Lincoln Avenue. The Studl map extended District 3 south and southwesterly to Jones Ave, thereby bringing all of Lincoln Avenue into District 3.

14. Since the time that the Court began drafting this order, Ms. Meggers informed the Court that there was an error in her proposed maps that effect one census block involving

one person. That block appeared in District 2 when it should have been placed in District 1. Meggers is in the process of submitting revised Albany3–LDM and Albany4–LDM which will be entitled Albany3R–LDM and Albany4R–LDM. This error does not effect any fact that is an issue in this case or the overall deviations of proposed Meggers' plans. The corrected Albany4R–LDM will be filed as an addendum to this order upon receipt. Therefore references to Meggers3 and Meggers4 refers to the corrected maps yet to be received.

deviation of −1.54%, with an overall deviation of 2.47%. The remaining districts have a deviation of less than one percent.

Of the two new plans proposed by Ms. Meggers, she favors Meggers4. According to Ms. Meggers, the Meggers4 satisfies four factors: (1) the plan is a minimum change plan; (2) the plan minimizes disruption to voting precincts and will expedite work by election officials to move and notify voters of their new district assignments; (3) it maintains all the incumbents and candidates in the districts for which they qualified; and (4) it minimizes voter confusion. (Meggers Letter, December 16, 2003). The Court finds that the Meggers4 plan not only satisfies the statutory and constitutional foundations underlying one-person, one-vote, it cures the main objection that Plaintiffs had to the Meggers1 plan.

Plaintiffs, though not clearly and forcefully, complained that the Meggers1 plan as it dealt with District 4 was retrogressive. (Tab 34). Plaintiffs argue that black voting strength has increased in Ward 4 over the past two decades. Plaintiffs complain that by 1990, the census showed that the black population had increased to 40% in Ward 4. However, when the city redistricted in 1990, the black population in Ward 4 was reduced to 30%. Based on the 2000 census, Plaintiffs argue, the black population in Ward 4 had increased to "nearly 51%." (Tab 34). Plaintiffs then argue that the plan proposed by the city, the Legislative Plan, reduced black population to 31%. (Tab 34).

Assuming that Plaintiffs' population percentages are correct, Plaintiffs have not supplied any data to support their arguments, Plaintiffs complaints are directed more to the 1992 benchmark plan and to the 2001 legislative plan submitted by Defendants to the Justice Department. While the complaints in that regard may be accurate, they are misplaced in this litigation. The validity of the benchmark plan is not an issue in this litigation and the Defendants did not submit the Legislative Plan to the Court for consideration. To the extent that Intervenor Pope has submitted a plan that is essentially the same as the Legislative plan, the Court has already decided not to consider it further because of the preclearance requirement.

The Meggers1 plan proposed a District 4 which contained a total black population of 6, 446 people or 50.01% of the population. The Meggers1 plan proposed a total black voting age population of 4, 379 people or 45.22%. The Meggers4 plan makes no changes to District 4 from the Meggers1 Plan, so the black population and black voting age population does not change. The Wright plan proposes a District 4 with a total black population of 7, 716 people or 60.06%. The plan also proposes a black voting age population of 5, 263 people or 55.69%.

Essentially, the Wright plan proposes to create an additional majority black voting district. To achieve the intended result of creating a fifth black voting district, the Wright plan required extensive modifications to Wards 2, 3, 4, and 5 when compared to the benchmark plan. Though not clearly delineated by his map, the Wright plan also requires significant division of various voting precincts. The Court acknowledges that the resulting Wright plan contains a lower overall deviation of .55%, as compared to the Meggers4 plan of 2.47%. However, as compared to the either the Meggers1 or Meggers4 plans, the Wright plan is by no means the "least change" plan.[15] Lastly, the Court notes

---

**15.** The Court notes that there was testimony from Wright which could support the conclusion that he developed the Wright plan with the specific intent to create a fifth majority black district. As the Meggers4 plan address-

that Ms. Meggers was accepted by all parties as an expert, and was actually initially employed by the Plaintiffs. There is no doubt that in proposing her plans, Ms. Meggers is free of any political taint or pushing some sort of political or social agenda.

As noted previously, the Studl Intervenors proposed a plan that rectified the "Williams problem." At the evidentiary hearing, the Studls' argued if the Court did not adopt their plan, the Court should adopt the Meggers1 plan or some variant thereof. Based on the foregoing analysis, and arguments of counsel, the Court need not further consider the Studl plan.

■ A thorough review of the competing proposed plans and after applying the law to the facts, the Court adopts the Meggers4 plan as the new voting map for the City of Albany. The Meggers4 map complies with Sections 2 and 5 of the Voting Rights Act and the requirements of the Equal Protection Clause. Further, taking into consideration the traditional redistricting principles, such as compactness of the districts, communities of interest, respect for previously drawn boundaries, the "protection" of incumbents and new candidates and the concept of least change, the Court finds that the Meggers4 plan, Albany4–LDM [16], is best for the citizens and voters of the City of Albany. Therefore, the Court ADOPTS said plan and ORDERS the Defendants to immediately implement the plan as the voting district plan for the City of Albany, Georgia.

From the beginning of this case, the Court has expressed its concern that the voters of Albany be allowed to vote on candidates for the City Commission and Mayor as soon as possible and practicable. The Court has heard evidence from the litigants, particularly the Defendants, as to the amount of time and the cost necessary in order to prepare for an election. Specifically, the Court heard from Defendant Carolyn Hatcher, Supervisor of Elections, who testified that her office would require about thirty (30) days notice to call an election. A review of various Georgia code sections reveals that political subdivisions should be able to hold an election with thirty (30) days notice. O.C.G.A. § 21–2–542 (special election to fill vacant U.S. congressional vacancy not less than 30 days after vacancy); O.C.G.A. 21–5–544 (special election to fill General Assembly vacancy, not less than 30 days or more than 60 days after vacancy). The Court notes that Defendants have argued repeatedly that it would be "more convenient" to hold this election simultaneously with the presidential primary election on March 2, 2004. While it might be more convenient, less troublesome and less expensive to hold the election then, the citizens' right to vote neither rests on nor is subordinate to such conveniences. The Court is very aware that the voting public has been prevented from electing its leaders pursuant to a plan which meets constitutional requirements since the 2000 census by the city commissioners', and other political groups, inability to formulate a voting plan that complies with the Voting Rights Act and the U.S. Constitution. Thus additional expenditures could have been avoided simply by the timely adoption of an approved plan which would not have required Court intervention. A plan has now been put in place, therefore, Albany's citizens should not be further unduly

---

es the main legitimate concerns of Plaintiffs, the Court does not have to engage in the process of determining whether the Wright plan is the result of impermissible race-based

redistricting, thus requiring review under a strict scrutiny standard.

**16.** Albany4R–LDM, *see* footnote 14, *supra*.

delayed, even if inconvenient to voting officials.[17]

Therefore, the Court **ORDERS** that Defendants shall call and hold a special election for the expired terms for City Commission and Mayor on the **Second Tuesday of February, 2004, February 10, 2004.** Defendants shall take all necessary steps to ensure that the election complies with the Georgia code requirements as far as is practicable and consistent with this order. Defendants shall also take all necessary steps to inform the public of the election. Defendants are ordered to reopen qualifying for the election from **9 a.m., Monday, January 12, 2004, through 5 p.m., Wednesday, January 14, 2004.** The dates and places of qualification shall be timely advertised. Those candidates already duly qualified shall be deemed qualified for the special election. The Court shall also retain jurisdiction of this case to ensure compliance and proper enforcement of this order.

---

17. If the November election had been held as scheduled, no savings would have inured to the City in any case.